## AMR A. WASFI *v.* DEPARTMENT OF PUBLIC HEALTH ET AL.
### (AC 19418)

Foti, Schaller and Dupont, Js.

---

Argued September 15—officially released November 21, 2000

William F. Gallagher, with whom, on the brief, were Joseph F. Rigoglioso and Barbara L. Cox, for the appellant (plaintiff).

Richard J. Lynch, assistant attorney general, with whom, on the brief, were Richard Blumenthal, attorney general, and Heather Wilson, assistant attorney general, for the appellees (defendants).

*Opinion*

FOTI, J. The plaintiff, Amr A. Wasfi, a veterinarian, appeals from the trial court's judgment dismissing his administrative appeal. The defendants are the depart-

ment of public health (department),[1] which brought charges against the plaintiff, and the Connecticut board of veterinary medicine (board), which revoked the plaintiff's veterinary license. The plaintiff claims that the court improperly concluded that the board did not violate (1) General Statutes § 4-178 (7) and principles of due process by applying its specialized knowledge to the facts of this case and (2) either its statutory authority or the plaintiff's due process rights by revoking the plaintiff's license following one incident of misconduct by the plaintiff. We disagree with these claims and affirm the judgment of the trial court.

The following facts, found by the board, and procedural history are necessary to our resolution of this appeal. Prior to and during the incident giving rise to this litigation, the plaintiff held a Connecticut veterinary license. On November 28, 1992, a car struck Allison O'Connell's dog. O'Connell subsequently took the dog to the plaintiff's veterinary hospital for emergency treatment. After the plaintiff diagnosed and treated the dog's injuries, he informed O'Connell, and his treatment notes indicate, that he diagnosed a fracture to the dog's radius and that part of the proximal surface of her olecranon bone was missing. The plaintiff also told O'Connell that he repaired the tendons in the dog's leg with surgical steel wire. The plaintiff testified, and his treatment notes indicate, that he used number one and number two gauge nylon to repair lacerated tendons in the dog's leg. On the basis of its own expertise, the board found that number one or number two gauge nylon is inappropriate for the treatment of injured tendons in a dog's leg.

On December 7, 1992, O'Connell took the dog to Jeffrey LaCroix, a veterinarian, for further treatment.

[1] On July 1, 1995, the department of public health and addiction services became known as the department of public health. Public Acts 1995, No. 95-257, §§ 12, 21, 58; see also *Bruttomesso* v. *Northeastern Connecticut Sexual Assault Crisis Services, Inc.*, 242 Conn. 1, 3 n.3, 698 A.2d 795 (1997).

LaCroix removed the splint and sutures that the plaintiff had applied to the dog's leg. LaCroix palpated and took X rays of the dog's leg, as well as examined X rays that the plaintiff had taken of the dog's leg. LaCroix concluded, and the board agreed, that the X rays revealed no fractures. His palpation of the dog's leg revealed that no repair had been performed to any tendons because he found a fully mobile leg joint with no evidence of scar tissue on the leg. The board also found, on the basis of its expertise, that if the plaintiff had repaired the tendons with nylon, LaCroix should easily have been able to detect the nylon when he examined the dog. LaCroix also found that the dog was weight-bearing when he examined her on December 7, 1992. He testified, and the board found, that the dog would not be weight-bearing if she had sustained a tendon repair two weeks earlier. According to LaCroix's testimony, the dog would not have been weight-bearing for at least four weeks had she sustained a lacerated tendon in her leg.

After her visit to LaCroix's office with the dog, O'Connell contacted the department. The department held a compliance conference on August 10, 1993, and, on November 19, 1993, the department submitted charges against the plaintiff to the board. The statement of charges alleged that the plaintiff did not conform to the acceptable standard of care for veterinarians because the plaintiff (1) misdiagnosed the dog's condition, (2) misrepresented the dog's condition to her owners and (3) misrepresented to the owners the treatment that he provided to the dog.

On December 8, 1993, the department sent a notice of hearing to the plaintiff. The board held hearings on April 6 and 27, 1994. Counsel represented the plaintiff at the administrative hearings. In addition to hearing the testimony of the plaintiff, O'Connell and LaCroix, the board heard testimony from Edward A. Williams,

a veterinarian with considerable experience treating dogs. Williams reviewed the plaintiff's treatment notes, X rays and the X rays taken by LaCroix. He testified, and the board found, that the dog did not sustain a fracture and that the plaintiff did not use surgical steel wire to treat the dog's leg.

Williams also testified, and the board found, that the plaintiff violated the customary standard of care required of a licensed veterinarian when he informed O'Connell that the dog's leg was fractured and that he had treated it with surgical steel wire. On the basis of the testimony of LaCroix and Williams, as well as its own expertise in reviewing the X rays and treatment notes from this case, the board found that the dog had sustained no bone fractures and that the plaintiff had misdiagnosed her injuries. On the basis of O'Connell's testimony and LaCroix' examination, the board also found that the plaintiff had misinformed O'Connell concerning the dog's injuries and the treatment that he had provided.

The plaintiff defended his course of treatment and testified that he likely saved the dog's life. He claimed that he did perform a tendon repair on the dog, using number one or number two gauge nylon. He denied using, or telling O'Connell that he used, surgical steel wire. He argued that the type of tendon repair he performed could not be seen on X ray examination and that O'Connell misunderstood his explanation of the treatment he had given the dog.

The board concluded that the plaintiff's conduct violated General Statutes § 20-202 (2). Acting pursuant to the authority granted the board by General Statutes §§ 19a-17 and 20-202, the board ordered that the plaintiff's license be revoked effective forty-five days following the issuance of its decision. The plaintiff, thereafter, appealed to the Superior Court pursuant to General

Statutes § 4-183 (a).[2] Among other claims, he alleged
that the board violated his due process rights and that
the record did not contain substantial evidence support-
ing the board's conclusions. The court dismissed the
appeal. The plaintiff thereafter filed a motion for reargu-
ment on the issue of whether the board's sanction vio-
lated the plaintiff's due process rights. The court heard
argument on the motion but denied the relief requested.
This appeal followed. Additional facts will be set forth
as they become relevant in the context of the plain-
tiff's claims.

General Statutes § 4-183 (j)[3] governs appellate review
of agency decisions. "[W]e note that our review of an
administrative appeal is limited. Our Supreme Court
has established a firm standard that is appropriately
deferential to agency decision making, yet goes beyond
a mere judicial rubber stamping of an agency's deci-
sions. . . . Courts will not substitute their judgment
for that of the agency where substantial evidence exists
on the record to support the agency's decision, and
where the record reflects that the agency followed
appropriate procedures." (Citations omitted; internal
quotation marks omitted.) *Menillo* v. *Commission on*

---

[2] General Statutes § 4-183 (a) provides in relevant part: "A person who
has exhausted all administrative remedies available within the agency and
who is aggrieved by a final decision may appeal to the Superior Court as
provided in this section. . . ."

[3] General Statutes § 4-183 (j) provides in relevant part: "The court shall
not substitute its judgment for that of the agency as to the weight of the
evidence on questions of fact. The court shall affirm the decision of the
agency unless the court finds that substantial rights of the person appealing
have been prejudiced because the administrative findings, inferences, con-
clusions, or decisions are: (1) In violation of constitutional or statutory
provisions; (2) in excess of the statutory authority of the agency; (3) made
upon unlawful procedure; (4) affected by other error of law; (5) clearly
erroneous in view of the reliable, probative, and substantial evidence on
the whole record; or (6) arbitrary or capricious or characterized by abuse
of discretion or clearly unwarranted exercise of discretion. If the court finds
such prejudice, it shall sustain the appeal . . . ."

*Human Rights & Opportunities*, 47 Conn. App. 325, 331, 703 A.2d 1180 (1997).

"Judicial review of the conclusions of law reached administratively is also limited. . . . [I]t is the well established practice . . . to accord great deference to the construction given [a] statute by the agency charged with its enforcement. . . . Conclusions of law reached by the administrative agency must stand if the court determines that they resulted from a correct application of the law to the facts found and could reasonably and logically follow from such facts." (Citations omitted; internal quotation marks omitted.) *Cadlerock Properties Joint Venture, L.P.* v. *Commissioner of Environmental Protection*, 253 Conn. 661, 669, 757 A.2d 1 (2000). Our task is to review the court's decision to determine whether it comports with the Uniform Administrative Procedure Act (UAPA), General Statutes § 4-166 et seq., and whether "the court reviewing the administrative agency acted unreasonably, illegally, or in abuse of discretion." (Internal quotation marks omitted.) *Ferreira* v. *Zoning Board of Appeals*, 48 Conn. App. 599, 605, 712 A.2d 423 (1998).

I

The board found, on the basis of its own expertise, that number one or number two gauge nylon is too thick to be used effectively in repairing tendons in a dog's leg. The plaintiff first claims that the court improperly approved the board's finding based on specialized technical knowledge without giving timely notice to the parties that it was doing so, in violation of General Statutes § 4-178 (7) and the plaintiff's due process rights. We disagree.

The procedural rules embodied in the UAPA, applicable to the present case, satisfy the procedural safeguards mandated by the due process clause. *Pet* v. *Dept. of Health Services*, 228 Conn. 651, 661, 638 A.2d 6 (1994).

A party to an administrative hearing possesses the right to respond to evidence, cross-examine witnesses and present evidence relevant to the issues before the agency. General Statutes § 4-177c.[4] "Due process of law requires not only that there be due notice of the hearing but that at the hearing the parties involved have a right to produce relevant evidence, and an opportunity to know the facts on which the agency is asked to act, to cross-examine witnesses and to offer rebuttal evidence." (Internal quotation marks omitted.) *Huck* v. *Inland Wetlands & Watercourses Agency*, 203 Conn. 525, 536, 525 A.2d 940 (1987).

A

The present dispute concerns the application of specific evidentiary rules in contested cases, namely, subsections (6), (7) and (8) of General Statutes § 4-178. General Statutes § 4-178 (6) provides that "notice may be taken of judicially cognizable facts and of generally recognized technical or scientific facts within the agency's specialized knowledge . . . ." Section 4-178 (7) provides that "parties shall be notified in a timely manner of any material noticed, including any agency memoranda or data, and they shall be afforded an opportunity to contest the material so noticed . . . ." Agency members are prohibited from relying on nonrecord material facts about a dispute before them, such as facts learned from first-hand investigation of case-specific details, without giving the parties before them the opportunity to rebut such evidence. See *Palmisano* v. *Conservation Commission*, 27 Conn. App. 543, 548,

---

[4] General Statutes § 4-177c (a) provides: "In a contested case, each party and the agency conducting the proceeding shall be afforded the opportunity (1) to inspect and copy relevant and material records, papers and documents not in the possession of the party or such agency, except as otherwise provided by federal law or any other provision of the general statutes, and (2) at a hearing, to respond, to cross-examine other parties, intervenors, and witnesses, and to present evidence and argument on all issues involved."

608 A.2d 100 (1992). General Statutes § 4-178 (8), however, provides that "the agency's experience, technical competence, and specialized knowledge may be used in the evaluation of the evidence."

Administrative boards comprised of at least a majority of members expert in their field are presumed "competent to determine the issues upon the basis of their own knowledge and experience"; *Jaffe* v. *State Dept. of Health*, 135 Conn. 339, 350, 64 A.2d 330 (1949); and are entitled to decide the issues before them without expert testimony. See id. Our Supreme Court has noted that as long as an administrative board consists of a "majority of experts in the field involved in the case, the board may rely on its own expertise in evaluating charges against persons licensed by the board and the requisite standard of care by which to judge such cases." (Internal quotation marks omitted.) *Jutkowitz* v. *Dept. of Health Services*, 220 Conn. 86, 111, 596 A.2d 374 (1991); see also *Pet* v. *Dept. of Health Services*, supra, 228 Conn. 666.

The legislature, therefore, distinguishes between an agency's use of nonrecord facts as proof of the specific issues in a case and the agency's use of its expertise and technical competence when evaluating evidence on issues properly before it. Our Supreme Court discussed this distinction and noted that "[t]he difference between an administrative tribunal's use of non-record information included in its expert knowledge, as a substitute for evidence or notice, and its application of its background in evaluating and drawing conclusions from the evidence that is in the record, is primarily a difference of degree rather than of kind." (Internal quotation marks omitted.) *Levinson* v. *Board of Chiropractic Examiners*, 211 Conn. 508, 532, 560 A.2d 403 (1989). Parties are entitled to notice of any nonrecord facts that will constitute proof in a case. In contrast, however, "the examiner's use of his experience in evaluating proof

that has been offered is not only unavoidable but, indeed, desirable." (Internal quotation marks omitted.) Id., 532–33.

In *Breiner* v. *State Dental Commission*, 57 Conn. App. 700, 750 A.2d 1111 (2000), this court affirmed a trial court's decision declining to apply the futility exception to the doctrine of exhaustion of administrative remedies. The plaintiff in *Breiner*, a dentist, was the subject of a disciplinary proceeding before the state dental commission. He claimed that he could not receive a fair hearing because board members had taken a position publicly on a policy issue related to the dispute. Relevant to our inquiry in the present case is our reasoning in *Breiner* that the position taken by the board members concerned the standards of practice rather than knowledge or a position taken on the adjudicative facts specific to that dispute. "Standards of practice comment on the appropriate conduct of an entire profession, not just a particular individual. Accordingly, standards of practice . . . need not be treated as factual information contained in the record of an administrative proceeding." Id., 707. We analyze the issue before us mindful of these distinctions.

In the present case, the court found that the plaintiff's claim that he lacked notice that the board would use its own expertise regarding the proper gauge and type of the suture material is without merit. The court noted that after the administrative hearings, the board sent notice to the parties that it was opening the record to admit into evidence a sample of suturing material called chromic gut, also known as catgut. After the plaintiff objected, the board permitted him to present argument on the issue. At the subsequent hearing, which dealt with the issue of the suture material, the plaintiff offered the board a sample of the type of number two nylon suture material he claimed he used in his treatment of the dog. The plaintiff's attorney explained, in detail,

why the plaintiff used nylon and why it was a superior suture material for the type of procedure that the plaintiff allegedly performed. The board admitted into the record the number two gauge nylon that the plaintiff offered, and the plaintiff demonstrated for the board his technique in knotting the material. The court found that this hearing alone gave the plaintiff notice and an opportunity to address the board on this issue.

Our review of the record, as well, indicates that board members discussed with the plaintiff during the initial hearings the gauge of nylon appropriate to suture tendons in the dog's leg. During the plaintiff's questioning, the plaintiff discussed and defended his position to use number one and number two gauge nylon. A veterinarian on the board shared his experience using number two nylon to repair tendons, noting that it could be considered "rope," and stated that he used it while treating cattle.

Despite the plaintiff's arguments, the record supports the court's reasoning that the plaintiff had notice that the board was considering the propriety of the plaintiff's alleged use of number one or number two gauge nylon. The department's statement of charges put the plaintiff on notice that the board would investigate his deviation from the standard of care when he misdiagnosed and misrepresented the dog's injuries and when he misrepresented the treatment of those injuries. A central issue in this dispute focused on whether the plaintiff misrepresented the treatment he performed; resolving this issue required the board to determine if the plaintiff sutured tendons in the dog's leg. His testimony that he sutured tendons with number two nylon and that number two nylon was the proper material to use on the dog's injuries on November 28, 1992, and his demonstration before the board showing how he used the material were properly before the board.

The composition of the board, as well as § 4-178 (8), put the plaintiff on notice that the board would use its own expertise when determining whether the plaintiff's alleged acts conformed to the standard of care. The board is comprised, in part, of practitioners of veterinary medicine.[5] This composition alone provides notice that board members will bring their specialized knowledge to bear on the issues and evidence properly before them. The board did not import nonrecord proof about this case into its deliberations. Rather, after hearing the plaintiff's testimony about the suturing that he allegedly performed, the board applied its practical experience regarding the appropriateness of the suturing material that the plaintiff claims to have used. After hearing the plaintiff's testimony that he used nylon to repair the tendons in the dog's leg, the board, without needing expert testimony and on the basis of its own experience, was competent to determine whether the plaintiff's choice of suturing material complied with professional standards of care. See *Pet* v. *Dept. of Health Services*, supra, 228 Conn. 666; *Connecticut Building Wrecking Co.* v. *Carothers*, 218 Conn. 580, 593, 590 A.2d 447 (1991).

---

[5] General Statutes § 20-196 (a) governs the composition of the board. Section 20-196 (a) provides in relevant part: "The board shall consist of five members appointed by the Governor, subject to the provisions of section 4-9a, as follows: Three members of said board shall be practitioners of veterinary medicine residing in this state in good professional standing and two shall be public members. No member of said board shall be an elected or appointed officer of the Connecticut Veterinary Medical Association or have been such an officer during the year immediately preceding his appointment, or serve for more than two consecutive terms. The Commissioner of Public Health with the advice and assistance of said board may issue regulations to insure proper veterinary care and the protection of public health, considering the convenience and welfare of the animals being treated, methods recommended by the code of ethics of the national and state veterinary associations, proper registrations of veterinarians for prompt identification and accepted health and veterinary standards as promulgated by the Department of Public Health, Department of Agriculture health ordinances and state statutes and regulations."

The plaintiff cites *Marshall* v. *DelPonte*, 27 Conn. App. 346, 606 A.2d 716 (1992), for the proposition that the board was prohibited from relying on its own expertise without giving notice to the plaintiff that it would do so. In *Marshall*, a hearing officer improperly relied on his own expertise or judicial notice without giving notice to the parties, in violation of § 4-178 (7). Id., 352–53. That case is distinguishable from the present case because, unlike the facts here, the agency officer in that case reached his decision by relying only on proof of the specific blood alcohol content of the plaintiff in that dispute, which was clearly outside of his professional expertise and not part of the record. The plaintiff's reliance on *Feinson* v. *Conservation Commission*, 180 Conn. 421, 429 A.2d 910 (1980), is also misplaced. The issue in that case was whether "commissioners who have not been shown to possess expertise in [the area of a complex pollution issue] may rely on their own knowledge, *without more*, in deciding to deny a license to conduct a regulated activity." (Emphasis added.) Id., 427. The court in *Feinson* found that the record lacked sufficient reliable evidence to sustain the commission's action. Id. In contrast, the experts on the board in this case had the authority to apply their professional experience to the facts and testimony before them.

B

Even if we were to conclude that the board violated § 4-178, we conclude that the board's finding on this specific issue nonetheless constituted harmless error under the circumstances of this case. The board made numerous findings, apart from finding that the plaintiff's choice of number one or number two gauge nylon was, in its experience, inappropriate, to support the conclusion that the plaintiff misdiagnosed and misrepresented the dog's injuries. The critical finding underlying the board's decision occurred when the board believed

LaCroix's testimony that "no repair had been done" and that "a dog would not be weight-bearing on a limb that had a tendon repair two weeks earlier."

The plaintiff contends that the board should have given him notice "that it would consider the appropriateness of the gauge of the suturing material used in the treatment of the dog." The plaintiff argues that if he had been given such notice, he "could have presented expert evidence concerning the gauge of the material as well." We are not persuaded that the additional testimony would have had any bearing on the board's critical finding that the plaintiff did not perform any tendon repair.

## II

The plaintiff next argues that the board's revocation of his license to practice veterinary medicine based on "a single charge of unskillfulness" violates his rights to substantive due process. The plaintiff essentially argues that this penalty is disproportionate "in light of the nature of the claimed dereliction, the equivocal evidence in the record supporting the charges, the complete recovery of the dog and the hardship to [the plaintiff]." We disagree.

Under state law, a licensed veterinarian may not have his or her license revoked except for cause. The plaintiff, therefore, had a constitutionally protected property interest in keeping his license. See *Hunt* v. *Prior*, 236 Conn. 421, 437–38, 673 A.2d 514 (1996). "[A] licensed physician has a right and estate in his profession of which he cannot be deprived without due process of law. . . . Cases are legion holding, in one way or another, that the right of a licentiate to practice his profession is a property right . . . ." (Internal quotation marks omitted.) *Lewis* v. *Swan*, 49 Conn. App. 669, 679, 716 A.2d 127 (1998).

A

To the extent that the plaintiff challenges the relevant statutes that govern the disciplinary action in this dispute, namely, §§ 20-202 and 19a-17, we evaluate the issue under a well established standard. "Constitutional attacks on the rationality of economic or social welfare legislation must rebut the presumption of constitutionality that attaches to such legislation. [T]he burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way." (Internal quotation marks omitted.) *Connecticut Education Assn., Inc.* v. *Tirozzi*, 210 Conn. 286, 299, 554 A.2d 1065 (1989).

Once the board finds any of the enumerated causes listed in § 20-202, it may take disciplinary action as set forth in § 19a-17, the section governing professions under the jurisdiction of the department of public health. General Statutes § 20-202 (2) permits the board to take action pursuant to § 19a-17 when there is "proof that the holder of [a veterinary] license . . . has become unfit or incompetent or has been guilty of cruelty, unskillfulness or negligence towards animals and birds . . . ." General Statutes § 19a-17 (1) allows for the revocation of a practitioner's license or permit.[6] After finding that the plaintiff violated § 20-202 (2), the board revoked his license.

We conclude that it is neither arbitrary nor irrational for the legislature to permit the board to take disciplinary action against practitioners whom it finds to have

---

[6] General Statutes § 19a-17 (a) provides in relevant part: "Each board or commission established under chapters 369 to 376, inclusive, 378 to 381, inclusive, and 383 to 388, inclusive, and the Department of Public Health with respect to professions under its jurisdiction which have no board or commission may take any of the following actions, singly or in combination, based on conduct which occurred prior or subsequent to the issuance of a permit or a license upon finding the existence of good cause: (1) Revoke a practitioner's license or permit . . . ."

acted negligently or unskillfully. The legislature certainly may protect the public interest by ensuring that licensed veterinarians adhere to professional standards of care. It is rational to allow the board, comprised in part of professionals, to protect the quality of the profession and the care given to animals by adjudicating alleged instances of unskillfulness or misconduct by licensed practitioners. Likewise, permitting the board to assess the appropriate penalty does not violate substantive due process. The legislature could have reasoned that board members who are familiar with the standards of the profession and the unique facts of each case that come before them are in the best position to levy an appropriate penalty against fellow practitioners. Also, the fact that the legislature delegated the power to revoke a professional's license following just one instance of misconduct is rationally related to the interests of punishing transgressors and preventing future harm to the animals under the care of such practitioners.

B

We next consider whether the board abused its discretion in its application of §§ 20-202 and 19a-17. As a preliminary matter, it is necessary to set forth our well established standard of review. " 'If the penalty meted out is within the limits prescribed by law, the matter lies within the exercise of the [agency's] discretion and cannot be successfully challenged unless the discretion has been abused.' *Gibson* v. *Connecticut Medical Examining Board*, 141 Conn. 218, 230, 104 A.2d 890 (1954). Sentencing is an inherently fact bound inquiry. In an administrative appeal, a reviewing 'court can do no more, on the factual questions presented, than to examine the record to determine whether the ultimate findings were supported, as the statute requires, by substantial evidence.' *Persico* v. *Maher*, 191 Conn. 384, 409, 465 A.2d 308 (1983)." *Pet* v. *Dept. of Health Services*,

supra, 228 Conn. 677–78. In other words, "[o]ur ultimate duty is to determine, in view of all of the evidence, whether the agency, in issuing its order, acted unreasonably, arbitrarily, illegally or in abuse of its discretion." (Internal quotation marks omitted.) *Murphy* v. *Commissioner of Motor Vehicles*, 254 Conn. 333, 343, 757 A.2d 561 (2000).

Section 19a-17 permits the board, after finding good cause, to take any of the available disciplinary actions, which vary in severity, enumerated in that section. The record contains substantial evidence supporting the department's charges against the plaintiff that he violated § 20-202 (2). The issue is whether the board abused its discretion by revoking the plaintiff's license under § 19a-17 (1) because of that incident. The plaintiff argues that his license was revoked for "a single instance of claimed unskillfulness." Given the board's findings that the plaintiff misrepresented that he repaired tendons in the dog's leg, misrepresented that he used surgical steel wire in those repairs, misdiagnosed a fractured radius and misdiagnosed an injury to the olecranon, we cannot conclude that the plaintiff has been punished for a single act.

In any event, the statute does not state that the penalty of revocation applies only to individuals who commit multiple acts of misconduct.[7] We are bound to read

[7] The plaintiff argued to the court that because § 20-202 (2) describes "unskillfulness or negligence towards *animals and birds*," the legislature intended punishment to be appropriate only when "repeated instances of negligence or unskillfulness" occur. (Emphasis added.) We agree with the court's rejection of this statutory construction. Such an interpretation could result in a case where a veterinarian could commit many acts of unskillfulness or cruelty during the treatment of a single animal, yet face no penalty. Because we are bound to interpret statutes "based upon the premise that the legislature intends to enact reasonable public policies"; (internal quotation marks omitted) *Burke* v. *Fleet National Bank*, 252 Conn. 1, 24, 742 A.2d 293 (1999); it follows that we must interpret § 20-202 to apply to situations involving a single incident of misconduct.

and interpret statutes as they are written. *Mack* v. *Lavalley*, 55 Conn. App. 150, 166, 738 A.2d 718, cert. denied, 251 Conn. 928, 742 A.2d 363 (1999). To read the statute as preventing the board from revoking a practitioner's license following one serious incident of misconduct until other acts of misconduct occurred would be inconsistent with the policies the statute was designed to implement. See *Doucette* v. *Pomes*, 247 Conn. 442, 455, 724 A.2d 481 (1999). When the legislature has deemed it necessary to impose such limitations on agency decision making, it does so expressly. The agency is not bound to explain its decision to impose one penalty as opposed to the other available penalties set forth in § 19a-17.

In several instances, our Supreme Court has upheld the revocation of a professional license based on one instance of misconduct. In one case, the state board of nursing examiners revoked a registered nurse's license after it found that she converted a drug to her own use. *Leib* v. *Board of Examiners for Nursing*, 177 Conn. 78, 81, 411 A.2d 42 (1979). In *Gibson* v. *Connecticut Medical Examining Board*, supra, 141 Conn. 220–21, a physician's license was revoked because of several acts of misconduct during the course of treatment of one patient. Furthermore, the court in *Jaffe* v. *State Dept. of Health*, supra, 135 Conn. 355, held that the medical examining board's choice of appropriate discipline was not an abuse of discretion, when the board revoked a physician's license after it found that he had performed an operation in an unprofessional manner.

The plaintiff argues that we should review the board's action in accordance with the decision of the New York Court of Appeals in *Pell* v. *Board of Education of Union Free School District No. 1*, 313 N.E.2d 321, 34 N.Y.2d 222, 356 N.Y.S.2d 833 (1974). That decision, however, involved "only disciplinary sanctions imposed internally in various administrative agencies and . . . not

. . . discipline imposed upon regulated persons or entities outside an administrative agency." Id., 331. Our task is not to second-guess the agency's choice of sanction. We look to whether evidence existed that gave the agency the discretion to impose the penalty of revocation. Our statutes dictate that matters under an agency's discretionary review must not be "arbitrary or capricious or characterized by abuse of discretion . . . ." General Statutes § 4-183 (j) (6). While these terms are necessarily vague, they also represent the authority that our General Assembly has vested in administrative agencies. As we are prohibited from reading into statutes provisions that are not clearly stated; see *Morales* v. *Pentec, Inc.*, 57 Conn. App. 419, 429, 749 A.2d 47 (2000); we will not restrict the deference we are statutorily bound to give administrative decisions in the absence of statutory authority.

Mindful of the board's purpose of insuring "proper veterinary care and the protection of the public health, considering the convenience and welfare of the animals being treated"; General Statutes § 20-196 (a); we cannot conclude that the board exceeded its authority or abused its discretion in revoking the plaintiff's license. In the analogous context of reviewing a board of education's exercise of discretion in terminating a teacher's contract following one incident of misconduct, our Supreme Court affirmed the board's decision, noting that "[w]hether termination is justifiable on the basis of a single incident is a qualitative not quantitative analysis; one serious incident can suffice." *Rogers* v. *Board of Education*, 252 Conn. 753, 771, 749 A.2d 1173 (2000). In the present case, members of the board found that the plaintiff performed below the standard of care in his profession, misdiagnosed injuries and deliberately misrepresented to an owner the treatment that he provided to the owner's animal. The board's punishment

does not appear to rest on any one particular finding, but on the cumulative effect of all of the findings.

The plaintiff's argument that his misconduct did not seriously injure the dog misses the point. The board was free to find, after having the benefit of questioning the plaintiff at length, that the plaintiff's failure properly to diagnose or to treat the dog's injuries demonstrated a risk that he would perform below the standard of care in the future. The board may have reasoned, as well, that misrepresenting to the dog's owner the services that he performed was not a simple oversight, but the type of conduct that could harm other pet owners in the future. On the evidence presented, the board could conclude that the plaintiff's conduct betrayed the trust that is reposed in him as a licensed veterinarian and compromised the integrity of his profession. The legislature vested in the board the power to evaluate the competency of veterinarians in this state and to adjudicate complaints and impose proper sanctions when warranted. The board found the plaintiff's conduct to deviate from the standard of care to such an extent that it warranted the revocation of his license. Under these circumstances, we cannot conclude as a matter of law that the board's action was arbitrary and capricious or an abuse of discretion.

The judgment is affirmed.

In this opinion the other judges concurred.