******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# RECYCLING, INC. *v.* COMMISSIONER OF ENERGY AND ENVIRONMENTAL PROTECTION
## (AC 38868)

Alvord, Keller and Pellegrino, Js.

*Syllabus*

The plaintiff appealed to this court from the judgment of the trial court dismissing its administrative appeal from the decision by the defendant Commissioner of Energy and Environmental Protection denying its application for an individual recycling permit and revoking its general permit to operate a recycling facility. A hearing officer for the defendant found that the plaintiff had submitted false, incomplete and incorrect information regarding its ownership and control in its application for an individual permit, and that the plaintiff had demonstrated a pattern or practice of inability or unwillingness to comply with the defendant's permit requirements in violation of statute (§ 22a-6m [a]). The hearing officer also found that the plaintiff, over a period of five years, had made numerous material omissions in its representations to the Department of Energy and Environmental Protection in violation of certain department regulations (§ 22a-3a-5 [d] [2] [B] and [C]), and that C, who was the beneficial owner of the plaintiff, had disguised his ownership to keep his past criminal convictions from tainting the permitting process. On appeal, the plaintiff claimed, inter alia, that the trial court improperly upheld the denial of its application for an individual recycling permit and the revocation of its general permit to operate a recycling facility, and that the hearing officer had applied an erroneous standard of review and improperly excluded relevant evidence. *Held*:

1. The trial court properly dismissed the plaintiff's appeal, there having been substantial evidence in the record to support the hearing officer's finding that the plaintiff had demonstrated a pattern or practice of noncompliance with the defendant's permit requirements to warrant the revocation of its general permit registration and the denial of its application for an individual permit; the plaintiff made numerous material omissions in its representations to the department in violation of § 22a-3a-5 (d) (2) (B) and (C), which require the disclosure of all relevant and material facts, as the plaintiff's application for the individual permit did not disclose its relationship to C or that C was involved in its formation, operations and financing, the plaintiff did not disclose the documents that would allow C to divest other individuals of control over the plaintiff, and the evidence of the allegations in a related civil action that involved C suggested a conscious effort to deceive the department throughout the permitting process.

2. The plaintiff could not prevail on its claim that the denial of its permit application was not warranted, even if the plaintiff's compliance history with the defendant's permit requirements demonstrated a pattern of noncompliance; § 22a-6m (a) expressly grants the department authority to deny an application for a permit where, as here, there is a pattern or practice of failure to disclose material and relevant information, § 22a-3a-5 (d) (2) (B) of the department's regulations permitted revocation of the plaintiff's permit because of its failure to disclose all relevant and material facts in its application or where information the plaintiff had provided in its application was false or incomplete, and the department, in exercising its authority to deny the permit application, did not act unreasonably, arbitrarily, illegally or in abuse of its discretion.

3. The plaintiff's claim that the trial court improperly upheld the defendant's permit decisions because the hearing officer failed to apply the correct standard of review was unavailing: the plaintiff's rights to fundamental fairness in the administrative hearing were not violated on the basis of a statement by the hearing officer that the question before her was whether the record supported the permit decisions by the department's staff, as the hearing officer conducted a thorough review of the voluminous record, and the level of her analysis was indicative of her fair and

impartial de novo review of the record.

4. The hearing officer did not abuse her discretion by excluding evidence the plaintiff had sought to present as to the department's prior enforcement actions against other waste facilities; that evidence, in the absence of a claim of selective enforcement, had no logical tendency to aid the trier in the determination of whether the plaintiff had misrepresented and omitted pertinent facts in its application, and the plaintiff conceded that it was not making a claim of selective enforcement.

5. The trial court's finding that there was no bias on the part of the defendant's administrative adjudicators was not clearly erroneous, the plaintiff having failed to show actual bias and, therefore, failed to overcome the presumption that administrative agents acting in an adjudicative capacity are not biased; the plaintiff pointed to no facts in the record that suggested a prejudgment of adjudicative facts, any claimed bias on the part of the defendant was irrelevant, as the defendant had recused himself from the proceedings, evidence of adverse actions or conclusions drawn against the plaintiff was insufficient to prove actual bias, and the plaintiff cited no authority for the proposition that an entire administrative agency would be biased as a result of an individual commissioner's public statement on a contested matter.

Argued October 10, 2017—officially released January 9, 2018

*Procedural History*

Appeal from the decision by the defendant denying the plaintiff's application for an individual recycling permit and revoking its general permit to operate a recycling facility, brought to the Superior Court in the judicial district of New Britain, where the court, *Schuman, J.*, granted the motion to intervene filed by the city of Milford; thereafter, the matter was tried to the court, *Hon. Henry S. Cohn*, judge trial referee; judgment dismissing the appeal, from which the plaintiff appealed to this court; subsequently, the court, *Hon. Henry S. Cohn*, judge trial referee, issued an articulation of its decision. *Affirmed*.

*Alan M. Kosloff*, for the appellant (plaintiff).

*David H. Wrinn*, assistant attorney general, with whom, on the brief, were *George Jepsen*, attorney general, and *Kirsten S. P. Rigney*, assistant attorney general, for the appellee (defendant).

*David A. Slossberg*, with whom was *Amy E. Souchuns*, for the appellee (intervenor city of Milford).

*Opinion*

ALVORD, J. The plaintiff, Recycling, Inc. (RCI), appeals from the judgment of the trial court dismissing its administrative appeal from the decision of the defendant[1] Commissioner of Energy and Environmental Protection (commissioner),[2] denying its application for an individual permit to construct and operate a volume reduction facility (individual permit) and revoking its general permit to construct and operate certain recycling facilities (general permit). On appeal, RCI claims that the trial court erred in dismissing its appeal because: (1) the denial and revocation was not warranted under the circumstances of this case; (2) the hearing officer violated its rights to a fair hearing by applying an erroneous standard of review; (3) the hearing officer erroneously excluded relevant evidence; and (4) the commissioner engaged in improper conduct during the proceedings. We affirm the judgment of the trial court.[3]

The following facts and procedural history are relevant to RCI's appeal. In 2008, RCI held a general permit registration to operate a limited recycling facility at 990 Naugatuck Avenue in Milford. In February of that year, RCI submitted an application to the Connecticut Department of Energy and Environmental Protection (department or DEEP) for an individual permit, which would allow RCI to increase the volume and breadth of its recycling operations. At the time, RCI was purportedly owned by Darlene Chapdelaine. Chapdelaine corresponded with the department on numerous occasions regarding the application for an individual permit, and represented herself as the sole owner of RCI. On February 10, 2012, nearly four years after RCI submitted its application, the department issued a tentative determination to approve RCI's application for an individual permit.

In April, 2012, before the department had made a final determination on the individual permit application, department staff learned of a lawsuit between Chapdelaine and Gus Curcio, Sr. over ownership of RCI. The pleadings in that lawsuit alleged that Curcio disguised his true ownership of RCI from the department to keep his past criminal convictions from tainting the permitting process. Documents attached to the complaint undermined RCI's representations to the department that Chapdelaine was the sole owner of RCI. On October 23, 2012, the court rendered judgment concluding that Curcio was the beneficial owner of 100 percent of RCI.

Consequently, in November, 2012, the department issued a tentative determination to withdraw its approval and deny RCI's application for an individual permit. The department also notified RCI that it intended to revoke its general permit registration. The department explained that the basis for its denial and

revocation was RCI's failure to disclose Curcio's extensive ownership interests and its false or misleading representations as to the control of RCI. On January 24, 2013, the department issued a revised and amended notice of intent to revoke RCI's general permit registration, adding, as a basis for revocation, RCI's and Curcio's inability or unwillingness to comply with permit requirements. The notice also relied on a June 11, 2012 notice of violation (NOV) issued to RCI by the department.

On February 27, 2013, the department provided RCI with a compliance conference in accordance with General Statutes § 4-182 (c),[4] at which it was afforded the opportunity to demonstrate to department staff that it had met all of the requirements for lawful retention of its general permit. On May 17, 2013, the department notified RCI that it had not changed its position as a result of the compliance conference and that justification remained to deny RCI's application for an individual permit and revoke its general permit registration.

On November 12, 2013, a five day hearing commenced before a department hearing officer.[5] On August 25, 2014, the hearing officer issued a proposed final decision concluding that RCI had submitted false, incomplete, and incorrect information regarding its ownership and control in its application to the department for an individual permit, and that it had demonstrated a pattern or practice of inability or unwillingness to comply with the department's permit requirements. The hearing officer found, inter alia, that Curcio tightly controlled RCI's financing, expenditures, and daily operations. In the proposed final decision, the hearing officer recommended that the department deny RCI's application for an individual permit and revoke RCI's general permit registration.

RCI subsequently raised exceptions to the proposed final decision. On November 12, 2014, Deputy Commissioner Susan K. Whalen[6] heard argument on the exceptions. On February 5, 2015, the deputy commissioner adopted the proposed final decision and denied RCI's individual permit application and revoked its general permit registration.

In March, 2015, RCI appealed to the Superior Court, challenging the department's decision. The trial court heard oral argument on January 7, 2016. On January 20, the court dismissed the appeal. This appeal followed.

I

RCI first claims that the court erred in upholding the deputy commissioner's decision because the department's denial of its application and revocation of its general permit registration was "arbitrary and capricious and an abuse of discretion . . . ." Specifically, it argues that department "[s]taff failed to demonstrate a pattern or practice of noncompliance sufficient to

warrant revocation of the general permit or denial of the individual permit," and "[e]ven if RCI's compliance history demonstrated a pattern of noncompliance, revocation and denial is not warranted." We disagree.

The following additional facts, which are based on the hearing officer's findings, are relevant to this claim. The hearing officer concluded that RCI provided false and incomplete information regarding its ownership in violation of section 6 of the general permit,[7] which demonstrated a pattern or practice of noncompliance with the terms and conditions of the general permit. James Barrett, who was nominated by Curcio as RCI's first president in 2008, testified that he owned all of RCI's stock at the time of the general permit application. That application requires, in relevant part, that the applicant or permittee (1) identify the owner and operator of the facility; (2) sign the application certifying that it is "true, accurate and complete"; and (3) report any changes in information provided. Barrett testified that he did not remember signing the general permit application. The signature on the registration certificate of the application read "Barret," with one "t" rather than two. Additionally, a letter concerning RCI's use of its property for recycling operations accompanied the application. The letter purported to be from and signed by Barrett, but Barrett testified that he did not write or sign the letter. Barrett testified that the signature on the application was not his, and that he did not know who signed the letter in his name.[8]

As the hearing officer found, "Curcio considered himself to be the owner of RCI and controlled RCI through Barrett." Barrett's testimony supported this conclusion. He testified, in relevant part, that: (1) he did not know where the books and records for RCI were kept and maintained; (2) he could not recall signing more than one check on behalf of RCI; (3) checks were "signed" by a rubber stamp of his signature, which he thought was kept by Chapdelaine; (4) he knew that Curcio was "financing the [department] application process," but did not know whether he was the sole source of money; (5) he was unaware of whether RCI paid any taxes while he was president; (6) he was unaware of whether operations were ongoing at the 900 Naugatuck site; and (7) when he filed for bankruptcy in December, 2008, he did not list RCI as a business in which he was an officer or director or in which he owned 5 percent or more of the voting securities within the past six years.

In October, 2009, Chapdelaine replaced Barrett as the president of RCI. Despite the requirement that a registrant or permittee report any changes provided on the general permit application to the department, RCI did not correct the registration information as required until February, 2010, when Chapdelaine signed the registration renewal application as president of RCI. Despite Chapdelaine's representations to the depart-

ment that she owned and controlled the operations of RCI, the hearing officer found that "Chapdelaine's claim that she [was] the owner of RCI and the exclusive holder of 100 percent of RCI's stock is not supported by the record and the logical conclusions that can be drawn from it." She based this conclusion, in relevant part, on the facts that: (1) there was no evidence that shares of RCI's stock were registered in Chapdelaine's name; (2) Chapdelaine executed a document shortly after her nomination as president providing that she is the owner of record of RCI " 'in name only' " and referencing other documents that show that she could be dispossessed of this ownership at any time by Curcio; (3) a shareholder's agreement signed by Chapdelaine in 2011 explicitly stated that she owned 10 percent or ten shares of RCI's stock and was required to offer it to RCI and the other stockholders before selling them to a third party; and (4) evidence received regarding the 2012 litigation between Curcio and Chapdelaine over the control of RCI revealed that Curcio nominated Chapdelaine to be the sole officer and director of RCI to facilitate the filing of RCI's permit application. The hearing officer further found that "[Chapdelaine] was not able to independently operate RCI. She did not decide how RCI would spend its money. She even lacked the power to maintain her own position with RCI; the 'beneficial paperwork' she signed could cause her to be removed from RCI at any time."

The hearing officer concluded that Curcio controlled the major decisions of RCI. Curcio directed that RCI be formed, negotiated the purchase of the business' property, decided to open a recycling facility at the property, nominated RCI's presidents, and controlled RCI with and through them. In his civil action against Chapdelaine, Curcio set out to prove his ownership and control of RCI. A copy of Curcio's sworn complaint was admitted into evidence at the hearing, along with a transcript of the trial in that case. On the basis of this evidence, the hearing officer found that Curcio "nominated Chapdelaine to be the sole officer and director of RCI for the purpose of facilitating the filing of RCI's permit application. She has, at all times, been required and directed to operate the business of the corporation at his direction and with his express approval." During the hearing, Curcio "tried to repudiate his prior sworn statements that he owned or was the owner of RCI, even when they were read to him during this proceeding, through evasive or vague answers to questions or outright denials of his prior statements." Curcio claimed that he was always the "beneficial owner" of RCI, with Barrett and Chapdelaine acting as his "nominees."

The hearing officer also found that RCI misrepresented or omitted pertinent information from its application for an individual permit. The individual permit application requires that a corporation identify its own-

ers, operator, officers, directors, and certain shareholders. The application must include agreements between all parties involved in the project for ownership and control of the facility. It also must include information that illustrates the relationship between parties involved in the ownership and control of the facility. The department expects an application to list all shareholders holding 20 percent or more of a corporation's stock, including stockholders holding stock only as a nominee for another person or entity or someone holding a beneficial interest in the stock. The application also requires an applicant to include all sources of funding and mortgages.

Despite these requirements, RCI's application for an individual permit did not disclose Curcio's involvement with RCI. Curcio, who testified that he "chose to stay as a beneficial owner" and did not want his name associated with the application, was not listed on the application. Curcio was not listed as having an ownership interest in RCI, being closely involved with its operations, nor being its sole source of funds. Additionally, neither the " 'beneficial paperwork' " that Chapdelaine signed, allowing her to be removed from RCI at any time, or the shareholder agreement that stated she owned 10 percent of RCI stock, was disclosed on the application.

On the basis of this evidence, the hearing officer recommended that RCI's general permit registration be revoked because (1) RCI failed to disclose who owned and controlled the company, in violation of section 6 of the general permit; (2) the certifying signature was false, in violation of § 22a-3a-5 (a) (2) of the Regulations of Connecticut State Agencies;[9] and (3) RCI demonstrated a "pattern or practice of noncompliance which demonstrates the applicant's unwillingness or inability to achieve and maintain compliance with the terms and conditions of the permit,"[10] as evidenced by its consistent failure to submit required quarterly reports on time or at all, and accurately or completely,[11] as well as the misrepresentations in its permit application and submittal of false, incomplete, and inaccurate information.

Citing regulations that permit the commissioner to revoke a permit or deny an application where misrepresentations by the applicant are discovered, the hearing officer further recommended that RCI's application for the individual permit be denied because RCI (1) misrepresented[12] its stock ownership interests on its application; (2) misrepresented information as to who owns and controls RCI on its application; and (3) did not provide complete or accurate information about its finances or funding sources. As noted, the deputy commissioner adopted the proposed final decision and denied RCI's individual permit application and revoked its general permit registration. The trial court, in dis-

missing RCI's appeal, concluded that it failed to disclose to the department "all required information."[13]

We begin with the applicable standard of review and principles of law that guide our analysis. "[J]udicial review of an administrative agency's action is governed by the Uniform Administrative Procedure Act (UAPA), General Statutes § 4-166 et seq., and the scope of that review is limited. . . . When reviewing the trial court's decision, we seek to determine whether it comports with the [UAPA]. . . . [R]eview of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable. . . . Neither this court nor the trial court may retry the case or substitute its own judgment for that of the administrative agency on the weight of the evidence or questions of fact. . . . Conclusions of law reached by the administrative agency must stand if . . . they resulted from a correct application of the law to the facts found and could reasonably and logically follow from such facts. . . . The court's ultimate duty is only to decide whether, in light of the evidence, the [agency] has acted unreasonably, arbitrarily, illegally, or in abuse of [its] discretion." (Internal quotation marks omitted.) *AFSCME, AFL-CIO, Council 4, Local 2405* v. *Norwalk*, 156 Conn. App. 79, 85–86, 113 A.3d 430 (2015).

General Statutes § 22a-6m (a) provides in relevant part: "In exercising any authority to issue, renew, transfer, modify or revoke any permit, registration, certificate or other license under any of the provisions of this title, the Commissioner of Energy and Environmental Protection may consider the record of the applicant for, or holder of, such permit, registration, certificate or other license, the principals, and any parent company or subsidiary, of the applicant or holder, regarding compliance with environmental protection laws of this state, all other states and the federal government. If the commissioner finds that such record evidences a pattern or practice of noncompliance which demonstrates the applicant's unwillingness or inability to achieve and maintain compliance with the terms and conditions of the permit, registration, certificate or other license for which application is being made, or which is held, the commissioner, in accordance with the procedures for exercising any such authority under this title, may . . . deny any application for the issuance, renewal, modification or transfer of any such permit, registration, certificate or other license, or . . . revoke any such permit, registration, certificate or other license." Additionally, the department's rules of practice[14] provide, in relevant part, that the commissioner may revoke, suspend, or modify a license if "[t]he licensee or a person on his behalf failed to disclose all relevant and material facts in the application for the

license or during any Department proceeding associated with the application . . . ." Regs., Conn. State Agencies § 22a-3a-5 (d) (2) (B).

## A

RCI first contends that "staff failed to demonstrate a pattern or practice of noncompliance," pursuant to § 22a-6m (a), "to warrant revocation of the general permit or denial of the individual permit." We disagree.

"The substantial evidence rule governs judicial review of administrative fact-finding under the UAPA. . . . An administrative finding is supported by substantial evidence if the record affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . The substantial evidence rule imposes an important limitation on the power of the courts to overturn a decision of an administrative agency . . . and to provide a more restrictive standard of review than standards embodying review of weight of the evidence or clearly erroneous action. . . . The United States Supreme Court, in defining substantial evidence in the directed verdict formulation, has said that it is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." (Citations omitted; internal quotation marks omitted.) *Dolgner* v. *Alander*, 237 Conn. 272, 281, 676 A.2d 865 (1996).

We conclude that there is substantial evidence in the record to support the hearing officer's finding of a pattern or practice of noncompliance that demonstrates RCI's unwillingness or inability to achieve and maintain compliance with the terms and conditions of the permit. The record revealed that, over a period of five years, RCI made numerous material omissions in its representations to the department, in violation of department regulations that require disclosure of all relevant and material facts; see Regs., Conn. State Agencies § 22a-3a-5 (d) (2) (B) and (C); as well as general permit requirements that prohibit providing incomplete information. See footnote 6 of this opinion. The record supports the hearing officer's finding that Curcio, through Barrett and Chapdelaine, controlled RCI. Barrett's testimony revealed that he was not involved in, nor familiar with, RCI's operations. RCI's application for the general permit was signed by a "James Barret," and Barrett testified that he did not remember signing the application or the letter that accompanied the application. Although Chapdelaine was involved with RCI's operations, ample evidence, such as the document, signed by Chapdelaine, that proclaimed her the owner of RCI "in name only," and evidence regarding the 2012 litigation between Curcio and her, supports the conclusion that Curcio ultimately controlled RCI's operations.

Applications for both a general and individual permit require the applicant to disclose information about the owners and operators of RCI. Despite these requirements, RCI's application for the individual permit did not disclose Curcio's relationship to RCI. RCI did not disclose that Curcio was involved in the formation, operations, and financing of RCI. RCI did not disclose the "beneficial documents" that would allow Curcio to divest Chapdelaine of control of RCI at any time. Furthermore, evidence of the allegations in the civil suit between Curcio and Chapdelaine suggested a conscious effort to deceive the department throughout the permitting process.

Plainly, we cannot say that there is not substantial evidence in the record to support the hearing officer's finding that RCI demonstrated a pattern or practice of noncompliance[15] to warrant revocation of its general permit registration and denial of its application for an individual permit. This court may not "retry the case or substitute its own judgment for that of the administrative agency on the weight of the evidence or questions of fact." (Internal quotation marks omitted.) *AFSCME, AFL-CIO, Council 4, Local 2405* v. *Norwalk*, supra, 156 Conn. App. 85.[16]

B

RCI next contends that, "[e]ven if Recycling, Inc.'s compliance history demonstrated a pattern of noncompliance, revocation and denial is not warranted." We are unpersuaded.

Courts give administrative agencies "broad discretion in the performance of their administrative duties, provided that no statute or regulation is violated." *Forest Walk, LLC* v. *Water Pollution Control Authority*, 291 Conn. 271, 286, 968 A.2d 345 (2009). "If the penalty meted out is within the limits prescribed by law, the matter lies within the exercise of the [agency's] discretion and cannot be successfully challenged unless the discretion has been abused." (Internal quotation marks omitted.) *Wasfi* v. *Dept. of Public Health*, 60 Conn. App. 775, 790, 761 A.2d 257 (2000), cert. denied, 255 Conn. 932, 767 A.2d 106 (2001). Here, the statutes and regulations that govern the department expressly grant the department authority to deny the individual permit application and revoke the general permit registration. Section 22a-6m (a) grants the department authority to deny an application for a permit, or to revoke a permit or registration, where the record evidences a pattern or practice of noncompliance, which the hearing officer found here in light of RCI's failure to disclose material and relevant information to the department. The department's rules of practice and the requirements of the general permit further provide that the department may revoke a license where the licensee fails to disclose all relevant and material facts in an application, or where

information provided on the application proves to be false or incomplete. See Regs., Conn. State Agencies § 22a-3a-5 (d) (2) (B); footnote 7 of this opinion. The department exercised its authority to deny the individual permit application and revoke the general permit registration based on the overwhelming evidence of failures to disclose material and relevant facts as required. This court must "decide whether, in light of the evidence, the [agency] acted unreasonably, arbitrarily, illegally, or in abuse of its discretion." (Internal quotation marks omitted.) *United Technologies Corp.* v. *Commissioner on Human Rights & Opportunities*, 72 Conn. App. 212, 225, 804 A.2d 1033, cert. denied, 262 Conn. 920, 812 A.2d 863 (2002).We conclude that it did not.

## II

RCI next claims that the court erred in upholding the deputy commissioner's decision because the hearing officer failed "to apply the correct standard of review for an administrative proceeding . . . ." Specifically, it argues that "[t]he administrative hearing process is founded on a fair and impartial hearing by a neutral hearing officer . . . conducting a de novo review of the evidentiary record," and because the hearing officer in this case "review[ed] the record for evidence in support of DEEP's findings, rather than undertaking an impartial de novo review" of the evidence, "[t]he entirety of the hearing officer's evaluation of the evidence, her findings of fact and her application of those facts to applicable law, is irretrievably tainted by her use of the wrong standard of review."[17] (Emphasis omitted.) We disagree.

The following additional facts and procedural history are relevant to this claim. In November, 2012, a department hearing officer held a five day hearing on the issues of the department's tentative determinations to deny RCI's application for an individual permit and to revoke its general permit registration. RCI, the department, and the city of Milford all fully participated in this hearing. The hearing officer heard the testimony of eight witnesses, some of whom were called to the witness stand more than once, including Chapdelaine and Curcio. Additionally, the hearing officer received over two thousand pages of documents into evidence.

Following the hearing, the hearing officer issued a proposed final decision. In the proposed final decision, she described her duty as hearing officer as follows: "In order to render my proposed final decision, I must review the record that has been compiled and developed during this proceeding to determine whether the record supports staff's tentative determination to deny RCI's permit application and revoke its general permit registration. My role is to evaluate the evidence in the record, find facts based on this record, and make conclusions of law based on these facts. The question

before me is not whether I would have reached the same conclusions as staff, but whether the facts and evidence in the record support staff's decision."

The proposed final decision contained extensive findings of fact, including findings on the issues of ownership and control of RCI, misrepresentations in RCI's individual permit application, and RCI's noncompliance with the requirements of its general permit registration. The hearing officer concluded that "RCI submitted an incomplete and misleading application that omitted certain required information and provided inaccurate and false information regarding its ownership, financial stability, and corporate structure and operations," and that "[t]hese misrepresentations and Curcio's history of noncompliance demonstrate a pattern or practice of noncompliance that shows RCI's unwillingness or inability to achieve and maintain compliance with the terms and conditions of the pending permit." The proposed final decision recommended that the department deny RCI's application for an individual permit and revoke RCI's general permit registration.

Both RCI and the defendant filed exceptions in response to the proposed final decision. On November 12, 2014, the parties appeared before Deputy Commissioner Whalen for oral argument on the exceptions. In relevant part, RCI argued that the hearing officer's statement in the proposed final decision that "[t]he question before me is not whether I would have reached the same conclusions as staff, but whether the facts and evidence in the record support staff's decision," appeared to "defer to staff's actions," and was indicative of "a fail[ure] to undertake a de novo review of the evidence." In the final decision, the deputy commissioner rejected those arguments and concluded that the hearing officer conducted "a balanced and unbiased review of all of the evidence before her and did not presume the validity of staff's actions." She characterized the hearing officer's statement as "an attempt to define the limited scope of the proceeding, which was to determine whether or not there was cause to revoke RCI's general permit and deny the application for the individual permit." The deputy commissioner concluded that "[i]t is clear to me that the hearing officer in this case took an impartial and unweighted review of the evidence before her, as evidenced by the detailed level of analysis set forth in the [proposed final decision]."

On appeal to the trial court, RCI again challenged the hearing officer's review of the evidence, arguing that "the required de novo review of the evidence was not undertaken . . . ." In its memorandum of decision, the trial court rejected this argument, stating: "The hearing officer stated that she would, as required by DEEP regulations, 'evaluate the evidence in the record, find facts based on this record, and make conclusions of

law based on these facts.' The hearing officer also stated that '[t]he question before me is not whether I would have reached the same conclusions as staff, but whether the facts and evidence in the record support staff's decision.' . . . RCI relies on this second sentence to claim that the hearing officer was merely looking at the record to see if it supported the DEEP staff's decision. On the other hand, the first quoted sentence shows that the hearing officer intended to meet the requirement[s] of . . . § 22a-3a-6 (d) (1), requiring a fair and impartial proceeding and ruling. The hearing officer's detailed findings and conclusions of law support this conclusion. The court will not overturn an administrative hearing officer's determination where the full context of the proposed final decision does not support RCI's contention."[18]

We begin by setting forth the applicable standard of review. "[J]udicial review of an administrative agency's action is governed by the Uniform Administrative Procedure Act (UAPA) . . . and the scope of that review is limited. . . . When reviewing the trial court's decision, we seek to determine whether it comports with the [UAPA]." (Internal quotation marks omitted.) *AFSCME, AFL-CIO, Council 4, Local 2405* v. *Norwalk*, supra, 156 Conn. App. 85–86. "[A]lthough we have noted that [a]n agency's factual and discretionary determinations are to be accorded considerable weight by the courts . . . we have maintained that [c]ases that present pure questions of law . . . invoke a broader standard of review than is ordinarily involved in deciding whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally or in abuse of its discretion." (Internal quotation marks omitted.) *Miller* v. *Dept. of Agriculture*, 168 Conn. App. 255, 266, 145 A.3d 393, cert. denied, 323 Conn. 936, 151 A.3d 386 (2016). "The right to fundamental fairness in administrative proceedings encompasses a variety of procedural protections. . . . The scope of the right to fundamental fairness in administrative proceedings, like the scope of the constitutional right to due process that it resembles, is a question of law over which our review is plenary." (Citation omitted; internal quotation marks omitted.) *FairwindCT, Inc.* v. *Connecticut Siting Council*, 313 Conn. 669, 711, 99 A.3d 1038 (2014).

We cannot conclude that, in light of the record before this court, RCI's rights to fundamental fairness in its administrative hearing[19] were violated on the basis of the hearing officer's statement that "[t]he question before me is not whether I would have reached the same conclusions as staff, but whether the facts and evidence in the record support staff's decision." As noted, the hearing officer heard five days of evidence. The hearing officer permitted each party to present testimony, enter exhibits, and cross-examine witnesses; she herself questioned witnesses. Over the course of the five day hearing, the hearing officer repeatedly

referred to building a record, and stated that she would review the record of the hearing to reach her conclusion. Upon review of the record, she made forty-five findings of fact, each supported by numerous citations to the record, and fifteen pages of well reasoned conclusions of law based on the application of the law to those facts. She credited the "abundant evidence" provided by the department, and concluded that RCI failed to "introduce evidence to refute [s]taff's conclusions and show that it had provided accurate, truthful and complete information on its permit application . . . [and] failed to provide any credible and convincing justification for its failure to include required information that would have revealed that Gus Curcio, Sr., was involved in RCI." It is clear, upon examination of the proposed final decision, that the hearing officer conducted a thorough review of the voluminous record before her. We agree with the deputy commissioner and the trial court that the detailed level of the hearing officer's analysis is indicative of her fair and impartial de novo review of the record before her.[20]

### III

RCI next claims that the court erred in upholding the deputy commissioner's decision because the hearing officer excluded relevant evidence at the hearing. Specifically, RCI argues that it was improper for the hearing officer to exclude evidence of prior department decisions or enforcement actions because "[a] key question in this proceeding is whether or not RCI's conduct reasonably warrants revocation of its general permit," and "[t]hat question cannot be answered in a vacuum; prior decisions and actions of the agency are relevant to the consideration of that question." We conclude that the exclusion of the documents at issue was not improper.

The following additional facts and procedural history are relevant to this claim. At the hearing, RCI sought to introduce two hundred pages of evidence relating to the department's enforcement actions against other waste facilities in Connecticut. The department objected on relevancy grounds. In response, RCI argued that the documents were relevant to testimony by a department employee, Darlene Sage, which it interpreted as suggesting a department policy to take adverse action against applicants or permit holders after a certain number of violations. Alternatively, both the department and the town argued that RCI was precluded from using the documents to make out a claim for selective enforcement,[21] as RCI had removed selective enforcement from its issues in its revised prehearing exchange materials. RCI conceded that it was "not making the claim of selective prosecution," but argued that the documents were relevant to the hearing officer in making her decision "as a guide." RCI asserted that the hearing officer "should be looking to what the department has done in similar and indeed more egregious

circumstances."

The hearing officer sustained the objections and excluded the documents from evidence.[22] In the proposed final decision, the hearing officer concluded that because selective enforcement was not an issue in the hearing, due to RCI's removal of selective enforcement as a legal issue in its prehearing materials, "evidence of how other applicants were treated by DEEP is therefore irrelevant" and was properly excluded as such.

RCI raised an exception to the hearing officer's exclusion of the documents. It argued that the hearing officer excluded the evidence on the basis that "it was tantamount to making an offer to show selective prosecution," and "[t]hat's not what the offer was about." RCI asserted that the offer of evidence "was about showing that the agency, if you look at the body of decisions that it made in this area, is acting arbitrarily and capriciously in an abuse of its discretion . . . ." In the final decision, Deputy Commissioner Whalen concluded: "The hearing officer properly excluded these exhibits as irrelevant. Selective enforcement was not an issue in the proceeding. Where evidence is irrelevant, it is not error to exclude it."

On appeal to the trial court, RCI again challenged the exclusion of the documents, arguing that "[t]he hearing officer's refusal to take into account past agency actions, actions which necessarily constitute expressions of agency policy, reflects her bias in favor of DEEP's positions in this proceeding . . . ." (Citation omitted.) The trial court concluded that "the hearing officer did not deny due process in her ruling, made under the UAPA's § 4-178 (1) evidentiary standard."

We begin by setting forth the applicable standard of review and legal principles that guide our analysis. Pursuant to the UAPA, in contested administrative proceedings, "[a]ny oral or documentary evidence may be received, but the agency shall, as a matter of policy, provide for the exclusion of irrelevant, immaterial or unduly repetitious evidence . . . ." General Statutes § 4-178 (1). The department's rules of practice[23] vest the hearing officer with the authority to "[a]dmit or exclude evidence and rule on objections to evidence . . . ." Regs., Conn. State Agencies § 22a-3a-6 (d) (2) (E). The department's rules of practice also prohibit the hearing officer from admitting "any evidence which is irrelevant, immaterial, unduly repetitious, untrustworthy, or unreliable." Regs., Conn. State Agencies § 22a-3a-6 (s) (1).

"In order to reverse an agency decision on the basis of an erroneous evidentiary ruling, it is necessary that the appellant demonstrate that substantial rights of [his] have been prejudiced because the administrative findings, inferences, conclusions, or decisions are . . . clearly erroneous in view of the reliable, probative,

and substantial evidence in the whole record." (Internal quotation marks omitted.) *Tomlin* v. *Personnel Appeal Board*, 177 Conn. 344, 348, 416 A.2d 1205 (1979). "[T]he plaintiff bears the burden of demonstrating that a hearing officer's evidentiary ruling is arbitrary, illegal or an abuse of discretion." (Internal quotation marks omitted.) *Gagliardi* v. *Commissioner of Children & Families*, 155 Conn. App. 610, 617, 110 A.3d 512, cert. denied, 316 Conn. 917, 113 A.3d 70 (2015).

Here, RCI has not shown that the hearing officer's decision to exclude the evidence of enforcement actions against other Connecticut waste facilities was arbitrary, illegal, or an abuse of discretion. Our case law has defined relevant evidence as "evidence that has a logical tendency to aid the trier in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable." (Internal quotation marks omitted.) *Merchant* v. *State Ethics Commission*, 53 Conn. App. 808, 822, 733 A.2d 287 (1999). The purpose of the hearing was to determine whether RCI made misrepresentations and omissions to the department and failed to comply with the requirements of its general permit, justifying denial of its application for an individual permit and revocation of its general permit registration. RCI sought to introduce evidence of how the department treated other waste facilities in Connecticut, in rebuttal to alleged testimony by Sage as to department "policy" in dealing with purported violators. While Sage did testify about the procedure followed when waste facilities do not comply with department reporting requirements, she did not express a department "policy" as to how purported violators were treated. If anything, her testimony demonstrated that department staff individually examines and responds to potential deficiencies in submitted materials.[24]

Evidence of how the department treated other waste facilities, in the absence of a claim for selective enforcement, has no logical tendency to aid the trier in the determination of the issues of whether RCI misrepresented and omitted pertinent facts to the department and failed to comply with the requirements of its general permit, justifying denial of its application for an individual permit and revocation of its general permit registration. Accordingly, we agree with the trial court that the hearing officer's ruling excluding the evidence under the UAPA § 4-178 (1)'s evidentiary standard was not arbitrary, illegal, or an abuse of discretion.

IV

RCI's final claim is that the court erred in upholding the deputy commissioner's decision because the commissioner engaged in improper conduct during the pendency of the proceedings. Specifically, it argues that

"the commissioner improperly engaged in *ex parte* communications with the town of Milford and then publicly issued an official statement which harshly criticized Plaintiff and in effect directed DEEP to rule against plaintiff." It further asserts that "DEEP staff was aware of this statement and apparently felt constrained by it (although they never admitted it)." We reject this claim.[25]

The following additional facts and procedural history are relevant to this claim. Before the department issued its tentative determination to deny RCI's application for an individual permit and revoke its general permit, the city of Milford approached then Commissioner Daniel C. Esty "to report its understanding of Curcio's role at RCI and to impress on him that it was inappropriate for DEEP to approve RCI's application for an individual permit." Following that meeting, Commissioner Esty released a public statement which read, in part: "Given questions now being raised about the ownership of Recycling, Inc., I do not believe it is appropriate to move forward with proceedings on a permit application for that company to operate a solid waste facility in Milford. . . . Let me speak very frankly here. This agency would never grant a permit to someone attempting to stand in for an individual with a background that would make them ineligible to obtain one. So, either a court decision will lift the cloud of doubt now hanging over this project so that the review process can move forward, or if not, the staff of this agency will withdraw the preliminary approval it granted and move to deny this permit application." Following this statement, but before the hearing, the commissioner recused himself from these proceedings and designated Deputy Commissioner Whalen as the final decision maker.[26]

On appeal to the trial court, RCI raised this issue for the first time at oral argument. In its memorandum of decision, the court concluded: "Here, RCI has not met its burden to show that the commissioner violated due process. He did talk to the town and issue a statement. But he also recused himself from the hearing as well as reviewing the hearing officer's proposed decision and issuing a final decision. RCI, in addition, did not brief this issue to the court. The court concludes similarly on an allied issue raised by RCI, that the DEEP staff was biased in its factual investigation by the commissioner's meeting with the town. RCI has not met its burden to show that the commissioner's actions dominated the staff's position at the administrative hearing, or earlier."

We begin with the applicable standard of review and principles of law that guide our analysis. "The applicable due process standards for disqualification of administrative adjudicators do not rise to the heights of those prescribed for judicial disqualification. . . . The mere

appearance of bias that might disqualify a judge will not disqualify an arbitrator. . . . Moreover, there is a presumption that administrative [adjudicators] acting in an adjudicative capacity are not biased. . . . To overcome the presumption, the plaintiff . . . must demonstrate actual bias, rather than mere potential bias, of the [adjudicators] challenged, unless the circumstances indicate a probability of such bias too high to be constitutionally tolerable. . . . The plaintiff has the burden of establishing a disqualifying interest." (Internal quotation marks omitted.) *Moraski* v. *Connecticut Board of Examiners of Embalmers & Funeral Directors*, 291 Conn. 242, 262, 967 A.2d 1199 (2009).

"In order to prove bias as a ground for disqualification, the plaintiff must show more than an adjudicator's announced previous position about law or policy . . . . He must make a showing that the adjudicator has prejudged adjudicative facts that are in dispute. . . . A tribunal is not impartial if it is biased with respect to the factual issues to be decided at the hearing. . . . The test for disqualification has been succinctly stated as being whether a disinterested observer may conclude that [the administrative adjudicator] has in some measure adjudged the facts as well as the law of a particular case in advance of hearing it." (Citations omitted; internal quotation marks omitted.) *Clisham* v. *Board of Police Commissioners*, 223 Conn. 354, 362, 613 A.2d 254 (1992). "In addition, we note that [a] determination of the existence or absence of actual bias is a finding of fact. . . . It is axiomatic that [t]his court will not reverse the factual findings of the trial court unless they are clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . In making this determination, every reasonable presumption must be given in favor of the trial court's ruling." (Citations omitted; internal quotation marks omitted.) *Jones* v. *Connecticut Medical Examining Board*, 129 Conn. App. 575, 588, 19 A.3d 1264 (2011), aff'd, 309 Conn. 727, 72 A.3d 1034 (2013).

RCI has failed to show actual bias on the part of the administrative adjudicators[27] in this case and, therefore, has failed to overcome the presumption that administrative agents acting in an adjudicative capacity are not biased. RCI has pointed to no facts in the record that suggest a prejudgment of adjudicative facts by either the hearing officer or the deputy commissioner. Counsel for RCI conceded as much at oral argument before this court.[28] Any claimed bias on the part of the commissioner is irrelevant, as he recused himself from these proceedings. RCI does little more than point to what it alleges was "[a]n overreaction all the way around" on the part of department staff as evidence of bias. Evi-

dence of adverse actions or conclusions drawn against a party is insufficient to prove actual bias. See, e.g., *State* v. *Fullwood*, 194 Conn. 573, 581–82, 484 A.2d 435 (1984) ("The defendant has equally failed to substantiate his related allegation that the trial judge's rulings on various pretrial and trial motions demonstrate actual bias. Adverse rulings do not themselves constitute evidence of bias."); *Elf* v. *Dept. of Public Health*, 66 Conn. App. 410, 426, 784 A.2d 979 (2001) ("[h]ere, the plaintiff does not point to any indication of actual bias on the part of the hearing officer other than that she found facts that supported a revocation of the plaintiff's license"). Furthermore, RCI cites no authority, and we are unable to find any, for the proposition that an entire administrative agency would be biased by an individual commissioner's public statement on a contested matter.[29] We conclude that the trial court's finding that there was no bias was not clearly erroneous.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The city of Milford successfully intervened as a defendant prior to the administrative hearing in this case. On appeal to the trial court, the city of Milford again intervened as a defendant.

[2] The Commissioner of Energy and Environmental Protection acts on behalf of the Department of Energy and Environmental Protection and references in this opinion to the department include the commissioner or his designee.

[3] In hearing administrative appeals such as the present one, the Superior Court acts as an appellate body. See General Statutes § 4-183 (j) (providing standard of review for administrative appeals to Superior Court); see also *Connecticut Coalition Against Millstone* v. *Connecticut Siting Council*, 286 Conn. 57, 85, 942 A.2d 345 (2008) (noting that Superior Court sits "in an appellate capacity" when reviewing administrative appeals).

[4] General Statutes § 4-182 (c) provides in relevant part: "No revocation, suspension, annulment or withdrawal of any license is lawful unless, prior to the institution of agency proceedings . . . the licensee was given an opportunity to show compliance with all lawful requirements for the retention of the license. . . ."

[5] General Statutes § 22a-208a (e) provides in relevant part: "The commissioner may hold a public hearing prior to approving or denying an application if in his discretion the public interest will be best served thereby, and shall hold a hearing upon receipt of a petition signed by at least twenty-five persons. . . ."

Section 22a-3a-5 (d) (1) of the Regulations of Connecticut State Agencies provides in relevant part: "Unless otherwise provided by law, any Department proceeding to revoke, suspend or modify a license shall commence with issuance of notice to the licensee. Such notice shall . . . inform the licensee that he may within thirty days of issuance of the notice file a request for a hearing . . . ."

[6] As discussed in part IV of this opinion, the commissioner recused himself from these proceedings and designated the deputy commissioner as the final decision maker.

[7] Section 6 of the general permit, which lists the general conditions of a general permit registration, provides, in relevant part, that if information provided on the application proves to be false or incomplete, the general permit registration may be revoked.

[8] When the department approved RCI's original application for its general permit registration, it was unaware that the signatures were not Barrett's.

[9] Section 22a-3a-5 (a) (2) of the Regulations of Connecticut State Agencies provides in relevant part: "An application, including any attachments thereto, shall be certified by the applicant and by the individual or individuals responsible for actually preparing the application, each of whom shall state in writing: 'I have personally examined and am familiar with the information submitted in this document and all attachments thereto, and I certify that

based on reasonable investigation, including my inquiry of those individuals responsible for obtaining the information, the submitted information is true, accurate and complete to the best of my knowledge and belief. I understand that a false statement in the submitted information may be punishable as a criminal offense, in accordance with section 22a-6 of the General Statutes, pursuant to section 53a-157 of the General Statutes, and in accordance with any other applicable statute.' . . ."

[10] See General Statutes § 22a-6m (a).

[11] The hearing officer concluded that RCI's failure to submit timely and accurate quarterly reports supported a finding of a pattern or practice of noncompliance with the requirements of the general permit. On appeal, RCI challenges this conclusion. The trial court, however, "decline[d] to resolve this factual dispute in light of its conclusions on disclosure . . . ." Because the trial court did not decide RCI's claim regarding its failure to submit timely and accurate quarterly reports, we decline to address it. See *Smith* v. *Redding*, 177 Conn. App. 283, 294, A.3d (2017) ("Connecticut appellate courts will not address issues not decided by the trial court" [internal quotation marks omitted]). Furthermore, although RCI filed a motion for articulation, it did not seek articulation on this point, nor did RCI file a motion for reargument. See *Pike* v. *Bugbee*, 115 Conn. App. 820, 826, 974 A.2d 743 ("It is . . . the responsibility of the appellant to move for an articulation or rectification of the record . . . or to ask the trial judge to rule on an overlooked matter. . . . In the absence of any such attempts, we decline to review this issue." [Internal quotation marks omitted.]), cert. granted on other grounds, 293 Conn. 923, 980 A.2d 912 (2009) (appeal withdrawn December 1, 2011). Accordingly, we decline to reach this claim.

[12] Although the hearing officer characterized these findings as "misrepresentations," she acknowledged that RCI's "misrepresentations took many forms, including omitted, inaccurate and false information . . . ."

[13] The trial court concluded that it need not reach the issue of whether RCI's submissions to the department amounted to "misrepresentations" on the ground that the plaintiff had violated "the statutes and applicable regulations" that "require full disclosure . . . ."

[14] Section 22a-209-4 (h) (3) of the Regulations of Connecticut State Agencies provides that "[a] permit to construct or operate may be revoked or suspended in accordance with Section 4-182 of the General Statutes and the Rules of Practice of the Department, as amended."

[15] RCI argues that "RCI respectfully maintains that DEEP has not demonstrated a 'significant wilful noncompliance' sufficient to revoke RCI's general permit and deny RCI's individual permit pursuant to § 22a-6m." This argument is without merit, as the statute requires only a finding of "a pattern or practice of noncompliance which demonstrates the applicant's unwillingness or inability to achieve and maintain compliance . . . ." General Statutes § 22a-6m (a).

[16] RCI relies on *Yaworski, Inc.* v. *Dept. of Environmental Protection*, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. CV-95-0550682 (June 21, 1996) (17 Conn. L. Rptr. 39), nonbinding authority, to support his argument that the hearing officer improperly found a pattern or practice of noncompliance.

In *Yaworski, Inc.*, the trial court affirmed the department's denial of a permit on the basis of, in relevant part, a history of failure to comply with state environmental laws and regulations in the operation of the landfill. Id., 41. RCI argues that "[i]n contrast to the years of repeated violations found in *Yaworski, Inc.*, Mr. Curcio has never been charged for an environmental crime and has only been involved in a civil enforcement matter relating to environmental compliance one time prior to the current matter." RCI's reading of *Yaworski, Inc.*, however, is misguided. *Yaworski, Inc.*, was an acknowledgement of the commissioner's discretion to find a history of noncompliance justifying the denial of a permit application. There, the trial court stated that the commissioner has discretion to deny an application for a permit, even where "the applicant has never been formally adjudicated as a violator." *Yaworski, Inc.* v. *Dept. of Environmental Protection*, supra, 17 Conn. L. Rptr. 41. Additionally, the court explicitly rejected an argument, similar to that of RCI here, that the commissioner's enforcement of the rule allowing denial of a permit application on the basis of past noncompliance was "arbitrary and discriminatory in view of the commissioner's failure to take similar action in other cases" on the ground that it amounted to a claim for selective enforcement, which was not at issue in the case. Id., 42.

Furthermore, Curcio's personal compliance history was not the sole basis

on which the department denied RCI's application and revoked its permit registration. Even if we assumed, arguendo, that Curcio's personal compliance history did not justify such actions by the department, denial and revocation would still be within the department's discretion on the basis of the repeated omissions of material and relevant information made to the department.

[17] Although RCI frames this argument as being based on the trial court's application of an incorrect "standard of review," the argument ultimately relates to the fundamental fairness of the administrative proceedings before the hearing officer, and we address that claim accordingly.

[18] Section 22a-3a-6 (d) (1) of the Regulations of Connecticut State Agencies provides: "The hearing officer shall conduct a fair and impartial proceeding, assure that the relevant facts are fully elicited, adjudicate issues of law and fact, and prevent delay and harassment."

[19] Although RCI characterizes these rights as "due process rights" and cites federal authority interpreting the due process clauses of the federal constitution, we note that our Supreme Court has ruled: "The right to fundamental fairness in administrative proceedings encompasses a variety of procedural protections . . . . In a number of administrative law cases decided after *Board of Regents* v. *Roth*, [408 U.S. 564, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972)], we have characterized these procedural protections as 'due process' rights. . . . Although the 'due process' characterization, at first blush, suggests a constitutional source, there is no discussion in these cases of a property interest in terms of constitutional due process rights. These decisions are, instead, based on a line of administrative law cases and reflect the development, in Connecticut, of a common-law right to due process in administrative hearings. Although the facts of the present case do not require us to explore its boundaries, this common-law right is not coextensive with constitutional due process. . . . Therefore, to eliminate any further confusion, we will discontinue the use of the term 'due process' when describing the right to fundamental fairness in administrative proceedings." (Citations omitted.) *Grimes* v. *Conservation Commission*, 243 Conn. 266, 273 n.11, 703 A.2d 101 (1997).

[20] Even assuming arguendo that the hearing officer's statement was an imprecise characterization of her review of the record, we cannot conclude that this statement undermined the entire hearing process. RCI cannot show that it suffered material prejudice as a result of this statement. See *Murach* v. *Planning & Zoning Commission*, 196 Conn. 192, 205, 491 A.2d 1058 (1985) ("not all procedural irregularities require a reviewing court to set aside an administrative decision; material prejudice to the complaining party must be shown" [internal quotation marks omitted]). As noted, the hearing officer detailed numerous findings of fact, supported by an abundance of citations to the record. Accordingly, RCI has failed to demonstrate that it suffered material prejudice.

[21] To make out a claim for selective enforcement, a claimant must prove that: "(1) the [claimant], compared with others similarly situated, was selectively treated; and (2) . . . such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bath faith intent to injure a person." (Internal quotation marks omitted.) *Cadlerock Properties Joint Venture, L.P.* v. *Commissioner of Environmental Protection*, 253 Conn. 661, 671, 757 A.2d 1 (2000), cert. denied, 531 U.S. 1148, 121 S. Ct. 1089, 148 L. Ed. 2d 963 (2001).

[22] The hearing officer explained her ruling as follows:

"Hearing Officer: But I'm not sure the department—it doesn't sound as if the department sits down and says, well, this one is just like the other ones where we have seven violations. If they do an eighth, just like all the others, they'll have this punishment. It sounds [like] it's very much a case-by-case kind of determination depending on the factors and depending on the nature of the problems. . . .

"What I heard the witness say was, we look at circumstances, we look at the nature of the offenses. So, you know, I could have—these could all be other facilities that have had fewer violations or whatever, and I don't think that would make a difference in my decision; I know it wouldn't. Because—just because the department has done something different for other facilities, they're not telling me that they have a policy where I'm going to be adding up what's happening. Well, this facility had this problem, so they got off and this one didn't. And as you said, selective enforcement is not an issue."

[23] The UAPA requires administrative agencies to "[a]dopt as a regulation

rules of practice setting forth the nature and requirements of all formal and informal procedures available provided such rules shall be in conformance with the provisions of this chapter . . . ." General Statutes § 4-167 (a) (1).

[24] Although Sage's testimony referred to the "typical" situation in which entities are able to correct insufficiencies on their reports after being contacted by the department staff one time, she also testified that department staff will "work with" entities who have failed to comply with reporting requirements:

"The Witness: Typically, we don't usually have to go past one time. Very rarely. Maybe two times to get reporting back. When it goes beyond that—

"Hearing Officer: Yes.

"The Witness: —it—I have to say, if we're talking about Recycling, Inc., it's one of the only ones that I've ever known to have to go back and forth so much.

"Hearing Officer: Really?

"The Witness: Yes.

"Hearing Officer: So, a more typical kind of problem is just something that's corrected the first time—

"The Witness: Correct.

"Hearing Officer: —or a second time? So, it's unusual for a facility to be more than one or two times—

"The Witness: Correct.

"Hearing Officer: —of having problems?

"The Witness: If an entity doesn't submit the reports at all or they haven't ever submitted the reports at all, they get a NOV, a notice of violation, typically, to start.

"Hearing Officer: And if your opinion, when a facility says, oh, it's just an oversight or, oh, we forgot, or, oh, you know, we'll do better next time, and they don't, what's your feeling on that?"

"The Witness: I mean, we work with them. We give them a chance to get the reports to us. If they don't then we proceed with enforcement."

[25] At the outset, we note arguments made by the department and the town that RCI has not properly preserved this issue for appellate review. In its memorandum of decision, the trial court, before deciding the issue on its merits, noted that RCI "did not brief this issue to the court." RCI, instead, raised this argument for the first time at oral argument before the trial court. Accordingly, because we reject RCI's argument that the commissioner's actions impacted these proceedings on the merits, we do not address these waiver arguments. See *Hadden* v. *Capitol Region Education Council*, 164 Conn. App. 41, 43 n.4, 137 A.3d 775 (2016) (declining to address defendant's waiver argument because even if claim were preserved properly, controlling precedent clearly disposed of it on merits); *State* v. *Tarasiuk*, 125 Conn. App. 544, 547 n.5, 8 A.3d 550 (2010) ("The state argues that this claim was waived because the defendant approved of the instructions at trial. Because we find that the charge as stated was proper, we decline to address the issue of waiver.").

[26] At the hearing, RCI offered into evidence a copy of the commissioner's public statement. Through counsel, RCI asserted: "I want it on the record that there is good cause for Mr. Esty's—Commissioner Esty to disqualify himself in [the role of final decision maker]." Counsel for the department responded that "the commissioner is not the final decision maker in this case," as Commissioner Esty had already decided to recuse himself.

[27] We note that RCI fails to identify which department employees "felt constrained" by the commissioner's statement. We assume, for purposes of this opinion, that RCI argues with respect to the hearing officer and deputy commissioner.

[28] At oral argument, RCI's counsel stated: "Although I have no evidence of this, there is some suggestion that that decision that the . . . commissioner announced *could have* improperly tainted the judgment of the staff. I cannot prove that. I have no way of proving it. But once that horse is out of the barn, you have to ask yourself: was the reason that the staff recommended denial, recommended revocation, was that impacted by [the commissioner's public statement]?" (Emphasis added.)

[29] While RCI's argument suggests that it also is challenging the commissioner's role in these proceedings as improper, it focuses on the effect of the commissioner's actions on other members of the department. We agree that under the facts and circumstances of this case, the commissioner may have acted inappropriately by issuing a public statement before the commencement of these proceedings, but conclude that RCI cannot show that it has suffered any adverse consequences as a result of the commissioner's

involvement, or lack thereof, in these proceedings. The commissioner recused himself from these proceedings before the hearing occurred. He did not participate in the hearing, and his decision to recuse himself as final decision maker was noted on the record. He did not act as the final decision maker and, instead, designated a deputy commissioner to act as such. To the extent that RCI challenges the commissioner's involvement in this case as improper, we conclude that RCI has not shown that it suffered any material prejudice as the result of the commissioner's actions, as any prejudice was cured by the commissioner's recusal. See *Murach* v. *Planning & Zoning Commission*, supra, 196 Conn. 205. Accordingly, any argument challenging the commissioner's role in these proceedings is without merit.

_____